**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 13-4231**

UNITED STATES OF AMERICA,

          Plaintiff – Appellee,

    v.

EDDIE WAYNE LOUTHIAN, SR.,

          Defendant – Appellant.

Appeal from the United States District Court for the Western District of Virginia, at Abingdon. James P. Jones, District Judge. (1:12-cr-00002-JPJ-PMS-1)

Argued: March 18, 2014          Decided: June 23, 2014

Before NIEMEYER, KING, and AGEE, Circuit Judges.

Affirmed by published opinion. Judge King wrote the opinion, in which Judge Niemeyer and Judge Agee joined.

**ARGUED:** Michael John Khouri, LAW OFFICES OF MICHAEL KHOURI, Irvine, California, for Appellant. Janine Marie Myatt, OFFICE OF THE UNITED STATES ATTORNEY, Abingdon, Virginia, for Appellee. **ON BRIEF:** Timothy J. Heaphy, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellee.

KING, Circuit Judge:

Eddie Wayne Louthian, Sr., was convicted in the Western District of Virginia of multiple offenses arising from a health care fraud scheme. On appeal, Louthian challenges each of his convictions, as well as the district court's forty-eight-month sentence and forfeiture order of nearly $1 million. As explained below, we are content to affirm.

## I.

### A.

Between 2005 and 2011, Louthian was President and Business Manager of the Saltville Rescue Squad, Inc. (the "Squad"), headquartered in Saltville, Virginia.[1] The Squad provided ambulance transport for medical emergencies, plus, inter alia, non-emergency transportation for dialysis patients. Although it was nominally a volunteer organization, the Squad had a paid staff, including Louthian.[2] The Squad billed Medicare and

---

[1] We recite the relevant facts in the light most favorable to the government, as the prevailing party at trial. See United States v. Madrigal-Valadez, 561 F.3d 370, 374 (4th Cir. 2009).

[2] Louthian's salary in 2005, prior to the fraudulent activities for which he was convicted, was approximately $28,000 per year. By 2010, his annual compensation had nearly doubled, eclipsing $52,000.

certain private insurers, including Anthem Blue Cross/Blue Shield ("Anthem"), for its services.

The Medicare system provides insurance coverage for ambulance transportation to and from dialysis centers when conveyance by other means would endanger a patient's health. Before authorizing payments for recurring, non-emergency transports, Medicare requires the issuance of a physician certification statement, also known as a Certificate of Medical Necessity ("CMN"). Once issued, a CMN is valid for a period of up to sixty days. Although a CMN is a prerequisite for such transports, the existence of a valid CMN does not definitively establish medical necessity. For that, Medicare relies on contemporaneous documentation of the patient's condition, as observed by an emergency medical technician ("EMT") or paramedic. The ambulance staff fills out a form referred to as a "call sheet" or "trip sheet" to provide that documentation.

The Medicare system is administered to ensure that claims for dialysis transports are paid to providers as quickly as possible. When such a claim is filed electronically, it must be paid within fifteen days of receipt. If a claim is filed on paper, it must be paid within twenty-nine days. Because of the large volume of such claims for Medicare payments, little or no inquiry is made into the validity of claims as they are received. If a paid claim is ultimately suspected of having

3

been fraudulently submitted, the authorities will investigate and pursue an appropriate reimbursement, in addition to potential criminal charges — a procedure sometimes referred to as "pay and chase."

B.

In April 2008, the Medicare Fraud Control Unit of the Virginia Attorney General's Office (the "Fraud Unit" or the "Unit") began investigating the Squad's activities. The Fraud Unit suspected that the Squad was engaged in a scheme to falsely bill Medicare and private insurers for services that were not medically necessary. The Unit's investigation focused on the Squad's billings for services to three dialysis patients, referred to herein by their initials: "JR," "NH," and "BM." The Squad provided round-trip ambulance transportation for those patients, up to three times per week, between their Saltville homes and a dialysis center in Abingdon, Virginia, about twenty miles away. For each such transport, the Squad billed Medicare approximately $1,200 to $1,500. The Squad would also bill Anthem, which was a secondary insurer for each of the three patients.[3]

---

[3] According to the indictment, the aggregate of the false billings to Medicare and Anthem with respect to the three patients was in the neighborhood of $2.6 million, consisting of more than $1.6 million billed to Medicare, plus about $1 million billed to Anthem. The Squad was alleged to have received (Continued)

During the investigation, Fraud Unit agents conducted video surveillance and interviewed the Squad's employees and other witnesses. The Unit's investigation established that JR, NH, and BM could all walk, drive, and engage in other physical activities without difficulty and, as a result, could readily have been transported to dialysis by some less extraordinary means. The Unit, working with the United States Attorney, also unearthed evidence that Louthian and other Squad employees had forged, altered, and lied about the three patients' medical conditions on documents submitted to support the Squad's requests for payments. During the investigation, Louthian appeared before a federal grand jury in Abingdon, where he testified concerning the Squad's activities.

On January 17, 2012, Louthian, Squad employee Monica Hicks, and the Squad itself were indicted by the grand jury. Louthian was charged in Count One with conspiracy to commit health care fraud, see 18 U.S.C. § 1349; in Count Two with the substantive offense of health care fraud, see id. § 1347; and in Counts Three through Six with making false statements for payment by a

---

reimbursements for these billings of around $880,000, accounting substantially for the district court's criminal forfeiture award exceeding $907,000.

5

health care benefit program, see id. § 1035.[4]  Counts Seven and Eight alleged money laundering, see id. § 1957, and Count Nine alleged that Louthian committed perjury before the grand jury, see id. § 1623.  Hicks and the Squad were charged with Louthian in Counts One through Six (the "health care offenses"), and the Squad was a codefendant with Louthian in Counts Seven and Eight. Count Ten charged Hicks and the Squad with making false statements for payment by a health care benefit program.  See id. § 1035.  Finally, the indictment included a Notice of Forfeiture to each defendant.  See id. § 982.  On June 28, 2012, Hicks pleaded guilty to Count One, pursuant to an agreement with the United States Attorney.  Louthian and the Squad, on the other hand, opted to go to trial.

C.

The jury trial of Louthian and the Squad, which began in Abingdon on September 10, 2012, lasted for about ten days.  The prosecution called roughly two dozen witnesses, including Medicare and Anthem administrators and investigators, law enforcement officers, current and former Squad employees, and neighbors and family members of the three dialysis patients.

---

[4] A "health care benefit program" is "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual."  See 18 U.S.C. § 24(b).  Medicare and Anthem are health care benefit programs for the purposes of the health care offenses.

The prosecutors initially focused on the Fraud Unit's observations of JR, NH, and BM. The evidence confirmed that, despite their need for regular dialysis treatment, the three patients lived relatively active lifestyles that belied their purported immobility. For example, patient JR regularly walked to and from the Squad's ambulance under her own power, often climbing into the ambulance through its side door. A neighbor saw JR at various times working in her yard, shopping at the grocery store, and walking around at other locations. Investigator Branson of the Unit conducted video surveillance of JR that corroborated the neighbor's account. One video clip showed JR being carried on a wheeled stretcher from the Squad's ambulance to her porch. She then climbed off the stretcher on her own and, showing no distress, got into a car to drive to a local senior center. Squad employees confirmed that JR was able to walk to and from the ambulance, step into the ambulance through its side door, and climb onto the stretcher without assistance.

The evidence concerning patient NH was similarly damning. Several video clips showed that NH was able to move around rather easily while being transported by the Squad, including a clip where NH was allowed to stop at a Hardee's restaurant for breakfast on the way to a dialysis appointment. Investigator Darby of the Fraud Unit described an incident in which NH,

7

immediately after being taken to her porch on a stretcher, stood in her doorway briefly conversing with Squad employees, then drove to a nearby town to shop at several stores. As with JR, Squad employees confirmed that NH was able to walk and stand, and was not bedridden. In fact, while being transported, NH would often sit in the captain's chair in the back of the Squad's ambulance. NH's mid-transport Hardee's visits were shown to be regular occurrences, and NH sometimes even walked into the restaurant herself. One Squad witness related that NH was a guest of the Squad at its holiday parties.

The third patient, BM, passed away before the Fraud Unit had an opportunity to observe him. BM's daughter, however, explained that BM had been her mother's primary caretaker. As such, BM did the grocery shopping, administered his wife's medicines, and kept up with her medical appointments. BM would drive himself to doctor's appointments, work in his garden, and help seal driveways for his son's paving business. Former Squad employees admitted that BM was using ambulance transport notwithstanding their knowledge that he could walk, stand, and drive. The prosecution also introduced BM's medical records, along with those of the other two patients. The records were replete with references indicating that each of them could walk, stand, and engage in nearly all the normal activities of daily living.

8

According to Hicks (the convicted codefendant), Louthian knew that Medicare and Anthem would not pay the Squad for transporting JR, NH, and BM to dialysis if their physical conditions were properly reported. Consequently, at Louthian's direction, Squad employees and volunteers engaged in a pattern of forging and altering CMNs, recording false information on call sheets, and making other material misrepresentations that Louthian hoped would "get [the] transports paid." J.A. 576.[5]

Because a patient's condition is subject to change, Medicare regulations require that transportation service providers obtain a new CMN for each patient every sixty days. Nonetheless, the Squad billed Medicare and Anthem for almost eighteen months (from July 2006 to January 2008) without obtaining a new CMN for either JR, NH, or BM. Instead, Louthian and Hicks altered the dates of old CMNs and submitted them in aid of reimbursement. According to Hicks, she and Louthian were well aware that the justifications in the old CMNs — for example, that the patients could neither stand nor walk, or were bedridden — were not true.

Louthian and his fellow Squad employees were even more brazen in their falsifications of call sheets generated for

---

[5] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.

9

transports. For example, Louthian taught Hicks to use "good word[s]" like "non-ambulatory" in her narratives, regardless of a patient's actual condition. J.A. 660. Tellingly, Hicks admitted that she did not then know what "non-ambulatory" meant — only that its incantation would help ensure payments. Once Hicks "knew how to fill them out to get them paid," Louthian instructed her to prepare call sheets in advance for other Squad employees, who would then sign them. Id. at 576. On those sheets, Hicks would make notations such as "unable to stand," even though she and Louthian, who were frequently in ambulances with the patients, knew the representations to be false.

Several Squad employees acknowledged using call sheets that were prepared in advance, and also being instructed by Louthian to embellish call sheets with fabricated details. Bunch, an EMT, identified several occasions when he placed false information on call sheets at Louthian's direction. For example, a call sheet dated May 31, 2006, when Bunch was the ambulance driver and Louthian was the attendant-in-charge, reported that NH was "non-ambulatory," "stretcher bound," "unable to stand," and in need of "O2 [oxygen] in transport." All of these entries were false. See J.A. 382-84. EMT Lee conceded that a July 1, 2006 call sheet with her name on it was written by someone else, explaining that the narrative contained false statements about JR's health. EMT Cassel admitted that

10

her statements on two call sheets were untrue.  Another Squad employee, McAllister, testified about call sheets involving patient BM.  Although the narratives indicated that BM's chronic health concerns caused him to fall frequently, McAllister had no recollection of BM ever falling.  Finally, EMT Bellinger admitted signing prerecorded call sheets and creating her own false narratives at Louthian's request.  Bellinger confirmed that Squad employees were instructed to use words like "non-ambulatory," even when the patients could walk, and that Louthian told her to report that NH was "partially blind," even though Bellinger had seen NH driving her own vehicle.  <u>Id.</u> at 695.

After Louthian learned that the dialysis transports were under investigation, he caused the Squad to alter the manner in which it transported patients, in an effort to cover up the false billing scheme.  Once Louthian realized the Squad was being watched by the investigators, he insisted that the patients be kept on stretchers at all times and not allowed to walk to and from the ambulances.  The Squad's minutes of a May 19, 2008 meeting reflected Louthian's change of procedure and

indicated why it was made, stating: "TRANSPORTS: TAKE IN AND OUT OF HOUSE ON COTS. HAD FOLLOWERS ON TRANSPORT." J.A. 1211.[6]

On February 17, 2009, Louthian was questioned before the federal grand jury regarding the changes he had made to the Squad's transport procedures after becoming aware of the Fraud Unit's investigation. That testimony resulted in the perjury charge against him. Count Nine alleged that Louthian's answers to the following grand jury inquiries were materially false:

> Q: Approximately when was it that the people who were being transported for dialysis were always on a stretcher? When did you say this has gotta end, these people have to be on a stretcher?
>
> A: I don't recall I said that except as far as [NH] was concerned. I, I told 'em, I said "I don't care how much hell she raises, I don't care what she says, she's either going on a stretcher or she ain't going."
>
> Q: And when was this?
>
> A: That's been a couple a years ago.
>
> Q: A couple of years ago?
>
> A: Yeah.
>
> Q: And you believe that she was being transported in that manner after that?
>
> A: That was my understanding, yes ma'am.
>
> Q: Okay. And she was eventually —

_____

[6] The word "FOLLOWERS," as used in the May 19, 2008 meeting minutes, was construed by the prosecutors to refer to Louthian's concern that the transports were being watched and investigated. The jury, by its verdict, agreed with that construction.

A:    <u>She was always on it when I went.</u>

J.A. 41 (emphasis in indictment).    The questions and answers particularized in Count Nine were submitted to the jury with the appropriate instructions.    The prosecutors argued that Louthian perjured himself when he told the grand jury that NH was always transported on a stretcher in his presence, and that things had been done that way for a couple of years.    Indeed, Louthian's testimony was directly contradicted by video evidence showing NH walking from the ambulance to her front door, with Louthian present, just nine months before his grand jury appearance.

The prosecution rested its case on September 18, 2012. Louthian then moved for acquittal under Federal Rule of Criminal Procedure 29, asserting that the evidence failed to make a prima facie showing of fraud.    The district court denied the acquittal motion, after which the defense also rested.    Following closing arguments and instructions, the jury deliberated and returned its verdict.    Louthian was convicted of the health care offenses in Counts One through Six, plus perjury as charged in Count Nine, but was acquitted of the Counts Seven and Eight money laundering charges.    The Squad was acquitted of all charges. Louthian thereafter sought post-trial relief on the basis of what he called "inconsistent verdicts," i.e., that although he

13

had been convicted, the Squad was acquitted. The court denied that motion as well.

D.

On November 19, 2012, the district court conducted a hearing on the prosecution's request for a criminal forfeiture. Evidence was then introduced demonstrating that Medicare and Anthem paid more than $900,000 for dialysis transports of JR, NH, and BM.[7] The prosecutors also presented evidence establishing the value of real estate and other property owned by the Squad, identifying various bank accounts into which fraudulent payments had been deposited.

On February 15, 2013, the district court filed its opinion on the criminal forfeiture issue. See United States v. Louthian, No. 1:12-cr-00002 (W.D. Va. Feb. 15, 2013), ECF No. 244. The court therein concluded that the government was "entitled to a money judgment of forfeiture against [Louthian]." Id. at 5. Accordingly, the court entered a preliminary order of forfeiture against Louthian of $907,521.77.

Louthian's sentencing hearing was conducted on March 20, 2013. The presentence report ("PSR") grouped his seven convictions and calculated a total offense level of 32 with a

---

[7] The evidence at the forfeiture hearing established that approximately $772,000 was paid to the Squad by Medicare, and another $135,000 was paid by Anthem.

14

criminal history category of I. As a result, Louthian's advisory Guidelines range was 121 to 151 months of imprisonment. At the hearing, Louthian lodged objections to several aspects of the PSR, including his punitive classification as a leader or organizer of the fraud scheme, an enhancement for abusing a position of trust, an enhancement for obstruction of justice, and the loss calculation.

The district court rejected each of Louthian's objections and adopted the PSR. The court also denied Louthian's request for a downward departure based on his age (sixty-one years), poor health (severe bleach allergy, depression, hypertension, osteoarthritis, and diabetes), and lack of a criminal history. The court nevertheless varied downward from the advisory Guidelines range and imposed seven concurrent prison terms of forty-eight months each. On March 21, 2013, the court entered its criminal judgment, incorporating the preliminary order of forfeiture. The forfeiture order was subsequently amended, necessitating amendment of the criminal judgment, which occurred on April 15, 2013. Louthian has timely noted this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

II.

Louthian contends that myriad errors infected his trial and sentencing. Most vigorously, Louthian challenges the sufficiency of the evidence used to convict him of the health care offenses in Counts One through Six and of the perjury offense in Count Nine. Louthian asserts further that the jury returned inconsistent verdicts, with the result that the district court should have granted his motion for post-trial relief. With respect to the sentence imposed, Louthian maintains that the court erroneously denied his request for a downward departure, and that he was improperly subjected to criminal forfeiture proceedings. We assess these contentions in turn.

A.

We first evaluate Louthian's challenge to the sufficiency of the evidence supporting his convictions on the health care offenses. We will sustain a guilty verdict "if there is substantial evidence, taking the view most favorable to the Government, to support it." United States v. Whitfield, 695 F.3d 288, 310 (4th Cir. 2012) (internal quotation marks omitted). Substantial evidence exists if there is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." Id. (internal quotation marks omitted).

16

In determining whether there is substantial evidence to support a verdict, we defer to the jury's determinations of credibility and resolutions of conflicts in the evidence, as they "are within the sole province of the jury and are not susceptible to judicial review." See United States v. Lowe, 65 F.3d 1137, 1142 (4th Cir. 1995).

In order to prove the conspiracy to commit health care fraud (Count One) the government was required to show, inter alia, an unlawful agreement between Louthian and at least one other person to commit health care fraud. See 18 U.S.C. § 1349. The substantive health care fraud offense (Count Two) required proof that Louthian had

> knowingly and willfully execute[d] . . . a scheme
> . . . (1) to defraud any health care benefit program;
> or (2) to obtain, by means of false or fraudulent
> . . . representations . . . any of the money . . .
> [of] any health care benefit program . . . in
> connection with the delivery of or payment for health
> care benefits, items, or services.

See id. § 1347. Finally, the four false statement charges (Counts Three through Six) required proof that Louthian "knowingly and willfully . . . ma[de] . . . materially false . . . or fraudulent statements . . . in connection with the delivery of or payment for health care benefits, items, or services." See id. § 1035.

The common thread sustaining or defeating Louthian's challenge to all six health care offenses is whether there was

17

sufficient evidence to prove that he made false and fraudulent misrepresentations to a health care benefit program. Consistent with his Rule 29 requests for acquittal, Louthian contends that the prosecution fell short of its burden because it failed to prove that the dialysis transport services provided to JR, NH, and BM were not "medically necessary." Br. of Appellant 9. In that regard, Louthian relies on the regulatory provision in 42 C.F.R. § 410.40(d)(1), which specifies (with emphasis added) that Medicare will pay for non-emergency ambulance transportation if a patient's medical condition, "regardless of bed confinement, is such that transportation by ambulance is medically required." Predicated on that regulation, Louthian argues that, although JR, NH, and BM were not bedridden, the prosecution nevertheless had to prove beyond a reasonable doubt that the patients could not otherwise have satisfied Medicare's requirements.

This contention fundamentally misapprehends the nature of the health care offenses. Louthian was not convicted of providing services to individuals who did not qualify for insurance reimbursements. His convictions were based upon false and fraudulent statements to Medicare and Anthem to secure payments for the dialysis transports. Louthian and those under his supervision falsely advised Medicare and Anthem that JR, NH, and BM needed ambulance transportation because they were

18

bedridden. The trial evidence was more than sufficient to support the jury's finding that such representations were untrue. The prosecution presented video, photographic, and testimonial evidence illustrating that the Squad's dialysis transport patients were able to stand, walk, drive, shop, garden, and perform manual labor, among other things. Nonetheless, Louthian repeatedly caused call sheets to be submitted describing the patients as bedridden, non-ambulatory, and unable to stand or walk. Louthian himself was involved in several of the relevant dialysis transports, and thus was personally aware of the patients' actual abilities. And when Louthian learned that the Squad's activities were under scrutiny, he caused the Squad to alter its practices in an effort to obstruct the Fraud Unit's investigation and to cover up his fraudulent misdeeds.

Even if Louthian's premise is assumed to be valid — that he could not be guilty of the health care fraud offenses unless the prosecution proved that the ambulance transports were not medically required — his defense theory would nevertheless fail. Employing a definition of medical necessity that suits his purposes, Louthian suggests that the health conditions of the three patients were such that, without ambulance transport, "there is a likelihood that they could have suffered serious medical issues." Br. of Appellant 10. But that argument

19

ignores the facts, i.e., that each of the three patients frequently rode in automobiles — or even drove vehicles themselves — and that, bedfast or not, they did not need an ambulance to get around. Viewing the evidence properly, a reasonable jury was entitled to find that ambulance transportation of the three patients from Saltville to the dialysis center in Abingdon was not "medically required" — by any definition.[8] We therefore reject Louthian's contention that the evidence was insufficient to support his convictions on the six health care offenses.

B.

Louthian's challenge to evidence sufficiency on the perjury offense in Count Nine must also be rejected. In order to meet its burden on that charge, the prosecution was obliged to show that Louthian knowingly made a false material declaration, under

---

[8] In its closing argument, the prosecution illustrated the absurdity of the notion that the patients' true medical conditions, if known to Medicare and Anthem, would have supported the conclusion that ambulance transportation was medically required. The prosecutor asked, "What if [Louthian and the Squad] actually wrote what happened," elaborating:

> Imagine a [call] sheet for [NH]. "Patient walked to ambulance from her home, stepped in through the side door, patient sat in the captain's chair until the ambulance brought her to Hardees. She went into Hardees for a ham biscuit, got back in." [The bill to Medicare] wouldn't get paid.

J.A. 913-14.

20

oath, in his testimony before the grand jury.  See United States v. Wilkinson, 137 F.3d 214, 224 (4th Cir. 1998).  At trial, the prosecution argued that Louthian's testimony to the grand jury (that NH had been transported on the stretcher for "a couple of years") was inconsistent with the video of Louthian watching NH walk from the ambulance to her home just a few months before his grand jury appearance.

Blaming the vagueness of the prosecutor's questions, Louthian contends that his answers were the product of confusion, rather than deception.  Specifically, he argues, the prosecutor failed to adequately define the word "transported" in the question:  "And you believe she was being transported in that manner after that?"  According to Louthian, if "transported" referred only to the time that NH was in the ambulance, then the prosecution failed to prove that his response was false.  See United States v. Hairston, 46 F.3d 361, 376 (4th Cir. 1995) (vacating perjury conviction when, despite multiple potential meanings, defendant's answer to grand jury inquiry was literally true).

But the Hairston decision does not stand for the proposition that we must vacate a perjury conviction whenever a perjurer, on appeal, can stir up some potential ambiguity in a grand jury's inquiries.  As Judge Motz recently explained, Hairston was predicated on the unique circumstance that the

21

allegedly false statement had an "obvious," non-perjurious meaning. See United States v. Sarwari, 669 F.3d 401, 406 (4th Cir. 2012). It does not apply in a situation — such as this — where "the focus is on the ambiguity of the question asked." Id. (internal quotation marks omitted).

Thus, although Louthian's lack-of-evidence theory on the perjury offense was appropriate for the jury's consideration, it is, as an appellate challenge to evidence sufficiency, without substance. The jury was permitted to conclude, given the context of the prosecutor's questions and the nature of the allegations against Louthian, that, consistent with the government's characterization, he understood the question and lied to avoid criminal liability. It would be inappropriate for us to second-guess the verdict in that regard. Therefore, we will not disturb Louthian's perjury conviction.

C.

Next, we examine de novo Louthian's contention that the district court erred in denying his post-trial request for acquittal or a new trial based on inconsistent verdicts. See United States v. Green, 599 F.3d 360, 367 (4th Cir. 2010). Relying on the Supreme Court's decision in New York Central & Hudson Railroad v. United States for the proposition that a corporation — like the Squad — is criminally liable for unlawful acts committed by its agent in the scope of his

22

employment, Louthian maintains that it was legally and logically inconsistent for the jury to convict him of the health care offenses while acquitting his codefendant, the Squad itself. See 212 U.S. 481 (1909).

Put simply, Louthian's inconsistent-verdicts argument is baseless. First, as the government points out, there are a number of reasonable explanations for the verdicts. For example, the jury may not have believed that Louthian was acting for the benefit of the Squad or within the scope of his employment. In either event, the verdicts would not be inconsistent.

More importantly, however, it is well-settled that a defendant "cannot challenge his conviction merely because it is inconsistent with a jury's verdict of acquittal on another count." See United States v. Thomas, 900 F.2d 37, 40 (4th Cir. 1990) (citing United States v. Powell, 469 U.S. 57 (1984)). Indeed, an inconsistent verdict can result from mistake, compromise, or lenity, and a jury could just as likely err in acquitting as in convicting. In any event, it can never be known "whose ox has been gored." See Powell, 469 U.S. at 65. "Given this uncertainty, and the fact that the Government is precluded from challenging the acquittal, it is hardly

satisfactory to allow the defendant to receive a new trial as a matter of course." Id.[9]

Louthian acknowledges the foregoing, but asks that we "carve out an exception to [the Supreme Court's] rigid and unworkable rule." Br. of Appellant 19. Having neither the authority nor the inclination to do so, we decline to intrude upon the verdicts.[10]

D.

Louthian also challenges his below-Guidelines sentence of forty-eight months as being excessive, in view of his age, poor health, and lack of a criminal history. For those reasons, he argues, the district court ought to have departed downward. We are unable, however, to review a sentencing court's decision not

---

[9] The rule against disturbing an inconsistent verdict has been steadfastly followed for more than eighty years. In Dunn v. United States, the Supreme Court held that a defendant could be convicted of keeping intoxicating liquor for sale even though the jury also found him not guilty of unlawful possession of intoxicating liquor. See 284 U.S. 390 (1932). The Court explained that "consistency in the verdict is not necessary." Id. at 393. More recently, in United States v. Collins, we declined to overturn a conspiracy conviction when the defendant's only coconspirator was acquitted of the same charge. See 412 F.3d 515, 519-20 (4th Cir. 2005) ("The law is established on this point . . . that a defendant is not entitled to a new trial when the jury reaches an inconsistent verdict.").

[10] Louthian also pursues, as a subpart of his inconsistent-verdicts contention, the proposition that his acquittal on the money laundering charges (Counts Seven and Eight) undermines the guilty verdict on the six health care offenses. We reject that contention as well.

24

to depart unless the court mistakenly believed that it lacked the authority to do so. See United States v. Brewer, 520 F.3d 367, 371 (4th Cir. 2008). Before pronouncing sentence, the court recognized its obligation to "consider any applicable departure policy statements by the Sentencing Commission." J.A. 1056. The court then considered Louthian's request for a downward departure under the Guidelines, but concluded that none was appropriate. Because the court understood its authority, but declined to exercise it on the facts of this case, Louthian cannot contest on appeal the court's failure to depart downward.

To the extent that Louthian challenges his sentence as otherwise unreasonable, we are unmoved. We review a court's sentencing decisions for abuse of discretion only. See Gall v. United States, 552 U.S. 38, 49-51 (2007). Any sentence that is within or below a properly calculated Guidelines range is presumptively reasonable. See United States v. Abu Ali, 528 F.3d 210, 261 (4th Cir. 2008). Such a presumption can only be rebutted by showing that the sentence is unreasonable when measured against the 18 U.S.C. § 3553(a) factors. See United States v. Montes-Pineda, 445 F.3d 375, 379 (4th Cir. 2006).

Louthian makes no assertion that his forty-eight-month sentence was tainted by procedural flaws, such as errors in calculating the Guidelines range, erroneously treating the Guidelines as mandatory, failing to properly consider the

25

§ 3553(a) factors, predicating the sentence on clearly erroneous facts, or failing to adequately explain the sentence. See Gall, 552 U.S. at 51. Meanwhile, we cannot conclude that his sentence was substantively unreasonable. See United States v. Mendoza-Mendoza, 597 F.3d 212, 216 (4th Cir. 2012). We observe that, although the court denied Louthian's request for a departure on account of age, health, and criminal history, it varied downward for those very reasons, imposing an aggregate sentence (48 months) that is less than half the low end of his Guidelines range (121 months). Louthian's sentence therefore cannot be deemed unreasonable.[11]

E.

Finally, Louthian contends that he was unfairly prejudiced when the prosecutors "chose to pursue" a criminal forfeiture against him after his trial. Br. of Appellant 26. Instead, Louthian maintains, the prosecution should have initiated a

---

[11] In conjunction with his sentencing challenge, Louthian also complains that his forty-eight-month sentence will have a "chilling effect" on others in the health care industry. Br. of Appellant 25. We are satisfied that this was probably the United States Attorney's intention, and that the Department of Justice will be pleased if this prosecution serves to forestall other health care fraud schemes. As the district court properly emphasized, "deterrence is an important factor in determining an appropriate sentence in this case," because "without an appropriate sentence of incarceration, other people might well believe that it is worth a chance to engage in medical billing fraud." J.A. 1060-61.

civil forfeiture action against him and the Squad, so that he could have lodged a cross-claim against the Squad for state-law indemnity.[12] As the government responds, however, a criminal forfeiture of tainted assets in a health care fraud proceeding is mandatory. See 18 U.S.C. § 982(a)(7) ("[T]he court . . . shall order the person to forfeit property, real or personal, that constitutes, or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense." (emphasis added)). In this situation, it is apparent that the prosecution and the court adhered to the applicable procedures. The grand jury properly alleged the intention of the government to seek a criminal forfeiture. See Fed. R. Crim. P. 32.2(a). Following the verdict, the prosecution requested a preliminary order of forfeiture, and the court conducted an appropriate hearing. See Fed. R. Crim. P. 32.2(b)(1)(A)-(B). The court then entered its preliminary forfeiture order, which was subsequently incorporated into the criminal judgment. See Fed. R. Crim. P. 32.2(b)(4)(B)-(C). Accordingly, despite Louthian's

---

[12] Civil and criminal forfeiture are distinct enforcement tools available to federal prosecutors. Whereas a criminal forfeiture is an in personam action that requires a conviction, civil forfeiture is an in rem action against the property itself. The two types of forfeiture are not, in most instances, mutually exclusive, and the choice of which type to pursue is often a tactical one committed to the sound discretion of the United States Attorney.

27

expressed preferences, there is no basis for concluding that the court erred with respect to the forfeiture proceedings.

### III.

Pursuant to the foregoing, we affirm the judgment of the district court.

AFFIRMED

28