**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-4267**

UNITED STATES OF AMERICA,

                Plaintiff - Appellee,

     v.

MARTIN MARTINEZ SALDANA,

                Defendant - Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Statesville. Richard L. Voorhees, District Judge. (5:12-cr-00049-RLV-DCK-1)

Argued: September 22, 2016        Decided: November 22, 2016

Before FLOYD and HARRIS, Circuit Judges, and DAVIS, Senior Circuit Judge.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Robert Lonnie Cooper, COOPER, DAVIS & COOPER, Fayetteville, North Carolina, for Appellant. Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee. **ON BRIEF:** Jill Westmoreland Rose, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

A jury convicted Martin Martinez Saldana of conspiracy to distribute and to possess with intent to distribute 50 grams or more of methamphetamine and 50 to 500 grams of a mixture and substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. § 846; and receiving or possessing a short-barreled shotgun that was not registered to him in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. § 5861(c)-(d). The district court sentenced Saldana to life imprisonment. On appeal, Saldana challenges both the district court's denial of his motion for judgment of acquittal and his within-Guidelines life sentence. Finding no error, we affirm.

I.

A.

In 2008, the Ashe County, North Carolina, Sherriff's Office received information from an anonymous source that Saldana was involved in drug trafficking. Officers began surveilling Saldana's property in 2010, around the time they learned from a Virginia-based investigative team that a person trafficking methamphetamine had crashed his motorcycle near Saldana's residence. In early 2012, the same team reported that a Hispanic man named Martin who worked at Adams Construction was trafficking methamphetamine.

During 2012, the investigation into Saldana's drug trafficking activity intensified. Officers orchestrated controlled purchases from two of Saldana's customers, Danny Eller and Bobby Shore. After the officers conducted searches of the men's residences that resulted in the seizure of methamphetamine, firearms, and cash, the two men agreed to cooperate in the Saldana investigation.

In late October and early November 2012, Eller conducted two controlled purchases of methamphetamine from Jose Pina, who rented a trailer on Saldana's property and ran Saldana's methamphetamine business when Saldana was in Mexico. The bag of methamphetamine Eller purchased from Pina was wrapped in black electrical tape, cellophane, and a dryer sheet, which is a common method of masking the odor of drugs. After the second purchase, Pina stopped returning Eller's phone calls. Accordingly, on December 11, 2012, officers decided to send Eller unannounced to Saldana's property to talk to either Saldana or Pina. Pina did not answer the door of his trailer, but Eller recorded a conversation with Saldana. During this conversation, Saldana told Eller that it was "too hot," which Eller testified meant that "the law [wa]s on [their] tails." J.A. 500. At another point in the conversation, Saldana said, "I'm telling you so, I mean, things around here are pretty, pretty quiet," meaning that Saldana was not conducting any drug

3

transactions at the time. J.A. 501-02. Saldana also told Eller to "lay low," or to "try to stay out of trouble." J.A. 502.

The next day, officers sent Shore to Saldana's property. Shore recorded Saldana saying that he was going to leave for Mexico the following night and asking Shore not to tell anyone about his plan. According to Shore, a few days prior to this meeting, Saldana had asked whether Shore knew if anyone was "getting in any trouble." J.A. 548.

Knowing that they had to act quickly, officers immediately executed a search warrant at Saldana's home and the adjacent property that Saldana owned. Officers discovered four unloaded firearms, including an unregistered, short-barreled shotgun; ammunition; electrical tape; cellophane; dryer sheets; latex gloves; one of Saldana's identification cards; an overnight bag containing men's clothing, Saldana's bank statements, and his other personal items; and two cell phones that were found on Saldana's person.

In February 2013, Pina disclosed where Saldana stashed methamphetamine and cash. Based on this information, officers conducted another search of Saldana's property and found approximately $50,000 concealed in a buried PVC pipe; methamphetamine wrapped in electrical tape, cellophane, and dryer sheets; empty buried PVC pipes; two magazines for a gun; and ammunition.

4

B.

A federal grand jury indicted Saldana and charged him with conspiracy to distribute and possess with intent to distribute methamphetamine, in violation of 21 U.S.C. § 846; possession of a firearm in furtherance of a drug-trafficking offense, in violation of 18 U.S.C. § 924(c); possession of a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1); possession of a firearm as a person convicted of a misdemeanor crime of domestic violence, in violation of 18 U.S.C. § 922(g)(9); and possession of a short-barreled shotgun that was not registered to him, in violation of 26 U.S.C. § 5861(c)-(d). The government later dismissed without prejudice the charges under 18 U.S.C. § 922(g).

Saldana pleaded not guilty and proceeded to a jury trial. Eller and Shore testified about their history of buying methamphetamine from Saldana, and Pina testified about selling methamphetamine on Saldana's behalf. Two of Saldana's coworkers also testified as government witnesses about Saldana's drug trafficking activity. Clara Caudell testified that she worked with Saldana at Adams Construction, that she bought methamphetamine from him fairly consistently for a period of five years, and that she sold some of the methamphetamine to support her drug use. James Hawkins, another of Saldana's coworkers at Adams Construction, testified that he sold "quite a

5

bit" of methamphetamine for Saldana and that sometimes Saldana would "front" the drugs and Hawkins would "pay him later." J.A. 579-80.

The district court denied Saldana's motion for a judgment of acquittal. The jury found Saldana guilty of participating in the drug trafficking conspiracy and possessing an unregistered, short-barreled shotgun, but it found him not guilty of possessing a firearm in furtherance of a drug trafficking crime.

In Saldana's presentence report, the probation officer grouped the offenses and calculated a base offense level of 38 using the 5.9 kilograms of actual methamphetamine attributable to Saldana. The probation officer recommended a 2-level enhancement because Saldana possessed a dangerous weapon, a 2-level enhancement because the offense involved importation of methamphetamine that Saldana knew was imported unlawfully, a 2-level enhancement because Saldana maintained premises for distributing methamphetamine, a 4-level enhancement because Saldana was an organizer or leader of the conspiracy, and a 2-level enhancement because Saldana "committed the offense as part of a pattern of criminal conduct engaged in as a livelihood." These enhancements yielded an adjusted offense level of 50. The probation officer recommended a total offense level of 43, the highest possible offense level under the Sentencing Guidelines.

With a criminal history category of I, Saldana's advisory Guidelines sentence was life imprisonment.

At sentencing, the Government advised the court that the parties had agreed Saldana would withdraw his objections to the presentence report and the Government would withdraw the two-level enhancements for importing methamphetamine, maintaining a premises for purpose of distributing a controlled substance, and engaging in criminal conduct as a livelihood. Saldana's adjusted offense level without these enhancements was 44, but his total offense level remained 43, and his Guidelines sentence was still life imprisonment.

Saldana's counsel moved for a downward departure or variance based on Saldana's physical appearance. USSG § 5H1.4, p.s. (providing that "[p]hysical condition or appearance . . . may be relevant in determining whether a departure is warranted, if the condition or appearance . . . is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines"). Counsel explained that Saldana had "scars all over his body" from the gunshot and stab wounds he sustained when he was robbed in Mexico. J.A. 755. Counsel argued that Saldana's scars and soft-spoken nature would prompt other inmates to perceive him as vulnerable, which would "subject [him] to aggression" while incarcerated. J.A. 755-56. It is also possible, counsel contended, that inmates would believe that

7

Saldana is an informant and "should be marked for death." J.A. 756. Counsel averred that, because Saldana is frail and not capable of protecting himself, his only options in prison are to join a gang or risk being marked as prey. Additionally, counsel argued that because there was no evidence of violence in the offense conduct and the jury did not convict Saldana of possessing the firearms in furtherance of the drug trafficking conspiracy, Saldana was far less "sinister" or "violent" than others sentenced by the court. J.A. 758. Finally, counsel emphasized Saldana's poor health, which reduced his life expectancy, and his yearning to be with his family.

The court denied Saldana's motion for a downward departure because Saldana's physical appearance and medical conditions were "not extraordinary in degree and d[id] not make a compelling case for a particular vulnerability in the prison environment." J.A. 764. The court noted that many of Saldana's ailments "appear to be successfully addressed by medication" and that Saldana's "scars could be taken as a mark of toughness" as easily as "a mark of vulnerability." J.A. 764. Moreover, according to the district court, Saldana's argument regarding the pressure to join a gang could apply to every inmate and, therefore, did not warrant a departure from the Guidelines.

The court also declined to grant a variance. The court emphasized the "extremely serious" nature of the offense

8

considering "the exceptional purity" of the methamphetamine and the "exceptionally high amount" of methamphetamine being "moved through numerous traffickers" under Saldana, who qualified as the "kingpin" of the methamphetamine trafficking organization. J.A. 765-66. The court also observed that Saldana used his property to "hide proceeds . . . and facilitate . . . distribution" and used his "naturalized citizenship" to easily move back and forth from Mexico. J.A. 765-66. The court stated that any damage to Saldana's family caused by his imprisonment can only be attributed to his choice to participate in criminal activity. J.A. 765. Finally, the court found that Saldana's argument regarding his lowered life expectancy was "speculative" and that Saldana's legitimate employment, which "likely provid[ed] a cover for his drug dealing," also did not justify a variance. J.A. 766.

The court sentenced Saldana to life imprisonment on the drug conspiracy charge and a term of 120 months on the firearm charge, to be served concurrently. Saldana filed a timely appeal.

II.

Saldana first challenges the sufficiency of the evidence supporting his drug conspiracy conviction. We review de novo the district court's denial of a motion for judgment of acquittal. United States v. Engle, 676 F.3d 405, 419 (4th Cir. 2012). In

9

assessing the sufficiency of the evidence, we determine whether there is substantial evidence to support the conviction when viewed in the light most favorable to the government. Id. "Substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of guilt beyond a reasonable doubt." Id. Thus, "[a] defendant bringing a sufficiency challenge must overcome a heavy burden, and reversal for insufficiency must be confined to cases where the prosecution's failure is clear." Id. (citation and internal quotation marks omitted).

To obtain a drug trafficking conspiracy conviction under 21 U.S.C. § 846, "the government must prove that (1) the defendant entered into an agreement with one or more persons to engage in conduct that violated 21 U.S.C. § 841(a)(1); (2) that the defendant had knowledge of that conspiracy; and (3) that the defendant knowingly and voluntarily participated in the conspiracy." United States v. Howard, 773 F.3d 519, 525 (4th Cir. 2014) (alterations and internal quotation marks omitted). "Given the clandestine and covert nature of conspiracies, the government can prove the existence of a conspiracy by circumstantial evidence alone." Id. (internal quotation marks omitted). "Evidence of continuing relationships and repeated transactions can support the finding that there was a conspiracy, especially when coupled with substantial quantities

10

of drugs." Id. at 526 (alterations and internal quotation marks omitted).

Having thoroughly reviewed the record, we conclude that there was more than sufficient evidence to convict Saldana of conspiring to distribute and possess with intent to distribute methamphetamine. The Government presented ample evidence demonstrating that Saldana was the leader of a drug trafficking operation involving a large quantity of methamphetamine. The evidence of Saldana's guilt included the following: (1) Eller's and Shore's recorded conversations with Saldana in which Saldana expressed his concerns about law enforcement activity in the area and said that he planned to flee to Mexico; (2) searches of Saldana's property that produced methamphetamine, drug packaging materials, firearms, ammunition, and a large sum of money; (3) testimony from Eller, Shore, and Caudell that they bought methamphetamine, some of which was used for redistribution, from Saldana, or from Pina in Saldana's absence; and (4) Pina's and Hawkins's testimony that they sold methamphetamine for Saldana. Although Saldana argues that the coconspirators who testified at his trial are untrustworthy, "[i]n evaluating the sufficiency of the evidence, we do not review the credibility of the witnesses." United States v. Foster, 507 F.3d 233, 245 (4th Cir. 2007).

III.

Saldana also argues that his sentence is unreasonable. We review a sentence for reasonableness under a deferential abuse--of-discretion standard. Gall v. United States, 552 U.S. 38, 51 (2007); United States v. Lymas, 781 F.3d 106, 111 (4th Cir. 2015). This review requires consideration of both the procedural and substantive reasonableness of the sentence. Gall, 552 U.S. at 51.

In determining whether a sentence is procedurally reasonable, we examine, among other factors, whether the district court considered the 18 U.S.C. § 3553(a) factors and sufficiently explained its chosen sentence. Id. at 51. Saldana contends that the court did not adequately address the § 3553(a) factors and that the court's explanation for the sentence was therefore deficient. We conclude that Saldana's argument is meritless, as the court provided a lengthy and thorough explanation for the sentence, drawing upon its careful consideration of the § 3553(a) factors, including the nature and circumstances of the offense, Saldana's history and characteristics, the need to afford adequate deterrence to criminal conduct, and the need to protect the public.

Saldana also challenges the substantive reasonableness of his life sentence. A sentence, such as Saldana's, that is "within . . . a properly calculated [Sentencing] Guidelines

12

range is presumptively [substantively] reasonable. Such a presumption can only be rebutted by showing that the sentence is unreasonable when measured against the 18 U.S.C. § 3553(a) factors." United States v. Louthian, 756 F.3d 295, 306 (4th Cir. 2014) (citation omitted). Saldana attempts to rebut the presumption by contending that the court failed to accord appropriate weight to the mitigating factors emphasized at the sentencing hearing, including the "extraordinary likelihood" that he will be victimized while in prison, the possibility that he will lose his strong familial relationships, his nonviolent nature, and his deteriorating health. Appellant's Br. at 26.

We conclude that Saldana has failed to make the requisite showing. The district court considered the mitigating factors and concluded that there was no reason to depart or vary from the Guidelines. Saldana did not demonstrate to the satisfaction of the district court that he was extraordinarily frail, and the court found that many of his medical issues are successfully addressed by medication. The court concluded that his physical appearance does not make him particularly vulnerable in prison because his scars could be taken as a mark of toughness. The court further determined that any potential pressure Saldana would face to join a gang applied to all prisoners and therefore did not justify a below-Guidelines sentence. There is no showing here that these findings are clearly erroneous.

13

The court did not ignore the likelihood that Saldana would lose the support of his family while incarcerated; rather, it concluded that losing familial connections is a consequence of Saldana's choice to participate in criminal activity. The court permissibly concluded that the massive amount of pure methamphetamine, Saldana's leadership role in the drug trafficking conspiracy, the numerous people involved in the conspiracy, and the fact that Saldana used his property and citizenship to further the conspiracy outweighed the mitigating factors presented by Saldana and warranted a life sentence. Although these findings were certainly not compelled by this record, they are not clearly erroneous, and thus do not render the imposition of a life sentence an abuse of discretion.

## IV.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

14