**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 23-4286

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

OSCAR PLIEGO-PINEDA,

Defendant – Appellant.

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  Catherine C. Eagles, Chief District Judge.  (1:20-cr-00272-CCE-1)

Argued:  November 1, 2024                          Decided:  February 24, 2025

Before WYNN and RUSHING, Circuit Judges, and Mary Geiger LEWIS, United States District Judge for the District of South Carolina, sitting by designation.

Affirmed by published opinion.  Judge Lewis wrote the opinion, in which Judge Wynn and Judge Rushing joined.

**ARGUED:**  Seth Allen Neyhart, LAW OFFICE OF SETH A. NEYHART, Durham, North Carolina, for Appellant.  Randall Stuart Galyon, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.  **ON BRIEF:**  Sandra J. Hairston, United States Attorney, Julie C. Niemeier, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.

MARY GEIGER LEWIS, District Judge:

Oscar Pliego-Pineda (Pliego-Pineda), who pled guilty to two counts of conspiracy, appeals the 120-month sentence imposed by the district court.  On appeal, Pliego-Pineda argues (1) the district court clearly erred in applying a three-level managerial role enhancement under the United States Sentencing Commission Guidelines Manual (Guidelines) and (2) his sentence is substantively unreasonable given the district court's error.  For the following reasons, we affirm.

I.

In 2019, the Federal Bureau of Investigation (FBI) and Drug Enforcement Administration (DEA), in cooperation with local law enforcement agencies, commenced an investigation into a Mexican drug trafficking organization, which was operating in Mexico, California, Georgia, and North Carolina.  Early in the investigation, they identified Pliego-Pineda, of Atlanta, Georgia, as the organization's "drug connection" in Atlanta.  J.A. at 169.

During the investigation, Pliego-Pineda coordinated the logistics for several multi-kilogram methamphetamine deliveries to a confidential source from the FBI (CS) and an undercover employee of the DEA (UC).  Pliego-Pineda also arranged for large amounts of drug proceeds to be wired into a Wells Fargo bank account bearing his wife's name.

In September 2019, a Mexican source offered to sell the CS up to thirty pounds of methamphetamine.  The parties agreed to an initial sale of one kilogram, which was to be arranged by Pliego-Pineda in Atlanta.  The CS traveled to Atlanta, where Pliego-Pineda

2

coordinated delivery of the methamphetamine through his courier, Francisco Yesdirguer Santana Pineda (Pineda).

Satisfied with the quality of the drugs, the CS subsequently asked the Mexican source about ordering a larger shipment. The Mexican source informed the CS the "guy in Atlanta," Pliego-Pineda, would need to trust the CS before a larger deal could be arranged. J.A. at 170.

The CS then called Pliego-Pineda, who instructed the CS to return to Atlanta one more time to make a purchase. Pliego-Pineda said he wanted to ensure the money was there before sending a large shipment of drugs to North Carolina.

The CS and Pliego-Pineda decided to meet on October 8, 2019, at a Mexican restaurant in Atlanta. The UC went with the CS to the meeting, during which Pliego-Pineda delivered one kilogram of methamphetamine in exchange for $5,000. Also during the meeting, Pliego-Pineda and the CS discussed future deliveries of methamphetamine to Greensboro, North Carolina. They agreed upon a price of $6,000 per kilogram, and Pliego-Pineda told the CS he would later instruct the CS and UC on where to wire the drug proceeds.

The CS and Pliego-Pineda had several conversations over the next couple months concerning a larger shipment to Greensboro. Pliego-Pineda informed the CS shipping methamphetamine in liquid form (soap) directly from Mexico would lessen the costs of transporting crystal methamphetamine from Atlanta to Greensboro. According to Pliego-Pineda, the soap would convert to approximately two kilograms of crystal methamphetamine. The CS agreed.

3

On December 3, 2019, Pliego-Pineda advised the CS the soap had been shipped from San Juan Del Rio, Queretaro, Mexico, to North Carolina and was ready for delivery. The following day, Pliego-Pineda's courier, co-defendant Wences Mondragon-Penaloza (Mondragon-Penaloza), delivered a seventeen-kilogram package containing 170 bars to the UC in Winston-Salem, North Carolina. Pliego-Pineda informed the CS he would send someone to Greensboro to teach the CS how to convert the soap into crystal methamphetamine. Subsequently, two individuals in Mexico gave the CS step-by-step conversion instructions.

Soon after this delivery, Pliego-Pineda asked the CS to pay Mondragon-Penaloza $200 for receiving the shipment from Mexico and delivering it to North Carolina. The UC later met with Mondragon-Penaloza and paid him $200. But, the CS and UC had yet to pay for the actual shipment.

On or about December 27, 2019, Pliego-Pineda asked the UC to pay $2,000 for the soap package. Pliego-Pineda provided the UC with a Wells Fargo bank account number bearing his wife's name. The UC wired $2,000 to the account on December 31, 2019.

In January 2020, Pliego-Pineda began discussing another multi-kilogram shipment with the UC, as the UC was disappointed in the results of the soap conversion. After several conversations, Pliego-Pineda agreed to sell the UC three kilograms of crystal methamphetamine at $6,500 per kilogram, for a total cost of $19,500, which included delivery to North Carolina.

Pliego-Pineda asked that a partial payment of $12,000 be made to his courier at delivery. But, when his courier, co-defendant Luis Alberto Garcia-Tovar (Garcia-Tovar),

4

delivered the drugs on February 6, 2020, the UC realized there were two kilograms, rather than the expected three kilograms.

The UC called Pliego-Pineda to report the problem. The parties subsequently agreed to a partial payment of $9,000 to reflect the reduced quantity. Approximately one week later, the UC wired an additional $4,000 to the Wells Fargo account.

On February 26, 2020, Pliego-Pineda arranged for another two-kilogram delivery to the UC. The delivery was half a kilogram short, so the UC spoke with Pliego-Pineda, inasmuch as he was the one who negotiated the deal. After the delivery, as per Pliego-Pineda's instructions, the UC wired a partial payment of $8,000 to the Wells Fargo account.

In March 2020, Pliego-Pineda, on behalf of his boss Orfael Bustos Macedo (also known as Guero), arranged a ten-kilogram delivery to the UC in North Carolina. Pliego-Pineda informed the UC only $10,000 would be needed at delivery, and the balance could be paid later.

Pliego-Pineda then provided the UC with a phone number for his courier, who was later identified as co-defendant Abril Bustos-Martinez (Bustos-Martinez). Bustos-Martinez delivered nearly ten kilograms to the UC and the UC's accomplice (UC2) in exchange for $10,000.

Shortly after this delivery, law enforcement stopped Bustos-Martinez and her sister in Alabama. Officers seized $287,609 from a hidden compartment in the vehicle, which included $10,000 from the sale.

5

Due to the seizure, Pliego-Pineda questioned the UC about the trustworthiness of the UC2. The UC then informed Pliego-Pineda the outstanding balance of the February 26, 2020, delivery had been wired to the Wells Fargo account.

On June 14, 2020, Pliego-Pineda advised the UC a shipment of liquid methamphetamine from Mexico would soon be arriving in North Carolina. Pliego-Pineda sent the UC a picture of the shipping label and advised he would send someone to North Carolina to assist the UC in converting the liquid to crystal methamphetamine. The package was ultimately intercepted, and Pliego-Pineda was arrested on a federal warrant.

During an interview with law enforcement, Pliego-Pineda admitted Guero was his source of supply and stated he began working for Guero several years earlier.

A Middle District of North Carolina grand jury returned a two-count indictment, charging Pliego-Pineda with conspiracy to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A), and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A) and (h). Pliego-Pineda pled guilty to both counts, pursuant to a written plea agreement, after which the United States Probation Office (USPO) prepared a presentence report (PSR).

The PSR calculated a base offense level of thirty-eight due to the attributable converted drug weight. Three levels were added under Guidelines § 3B1.1(b) based on the USPO's conclusion Pliego-Pineda was a manager or supervisor of a criminal activity involving five or more participants.

Two levels were also added under Guidelines § 2D1.1(b)(16)(C) because Pliego-Pineda was directly involved in importing a controlled substance while having an aggravating role. Additionally, two levels were added under Guidelines § 2S1.1(b)(2)(B), as the offense involved money laundering.

Giving Pliego-Pineda a three-point reduction for acceptance of responsibility, the PSR calculated his total offense level as forty-two. With Pliego-Pineda's criminal history category of I, his advisory Guidelines range was 360 months to life.

Pliego-Pineda objected to the three-level managerial role enhancement under Guidelines § 3B1.1(b) and the resulting two-level specific offense enhancement under Guidelines § 2D1.1(b)(16)(C). He contended the district court lacked evidence he had given orders, set prices, or controlled or directed another member of the conspiracy.

At the sentencing hearing, the district court noted Pliego-Pineda's objection on the managerial role enhancement and heard arguments from counsel. In the district court's finding the enhancement was appropriate, it stated as follows:

> Well, looking at these seven factors in the guidelines, 3D1.1, comment four, it is--seems to me, that he did exercise some decision making authority in the sense that he decided whether to go through- whether to arrange the deal. Now, that is the same kind of decision making authority any drug dealer has, you know, whether to sell to someone. So that, you know, that kind of decision making authority is fairly narrow, but of course here we are talking about repeat drug deals, very significant amounts of methamphetamine, and deciding whether to trust a seller--excuse me, buyer, and presumably a seller, but more the buyer here, is pretty significant decision making authority.
>
> The nature of the participation, he was obviously key to all of these transactions. He put the buyer together with those in the organization and the conspiracy for bringing the drugs to the deal. He certainly was involved in the recruitment and approval of the [UC] as an accomplice. I don't know what his right to share of the proceeds were, but the money is going into his

7

bank account, where presumably he was keeping certainly some of it, but I don't think I know a lot about that.

But his degree of participation in planning and organizing [was] very, very high. He was at the center of these deals, and he had--the nature and scope of the illegal activity, obviously very, very significant. A wide-ranging drug conspiracy involving a number of players at very significant amounts, and he was as [the AUSA] says, the hub of this.

The degree of control and authority exercised over others, that's an interesting point. I'm confident that if he had told the person, you know, the mule, the person delivering the drugs not to take them, that that person would have obeyed, that person would not have done it, and that, you know, was he able by himself to tell the person who delivered the drugs to do it? I don't know.

There is clearly some other people involved in the chain of the command but, you know, there could be mutual control, and we're not talking here joint control. We're not talking here about being an organizer or a leader with the five level enhancement.

We're talking about the manager or supervisor, and it is totally clear that he was supervising these operations. He had a lot of oversight. He was helping work through delivery problems. Quality problems involving the liquid meth, amounts--disputes over the amounts. He was involved in all of these things and he was communicating the prices to the buyer, and seems to have had at least some authority to negotiate a price.

I'm sure, you know, there may have been some constraints on that from others, but it seems to me, that he did have this supervisory role and this management role. You know, I appreciate that there is some--there is not direct evidence that he's telling people, you know, specific people do this, do that, but he is clearly managing and supervising the operation. I have no doubt that if he had told these other folks, don't do it, you know, they wouldn't have done it, that he had a degree of management and supervisory authority and clearly somebody is telling these folks, yes, go deliver the drugs, and he is telling the [UC], which is an important point, take--deliver the money this way, put it in the bank account. He is supervising the [UC's] actions, or managing them, certainly. Managing them might be a better word in that particular way.

So when I look at all of these things together, it seems to me he falls under the enhancement as it is defined in the guideline, and also find by a

8

preponderance of the evidence, which means I'll overrule [Pliego-Pineda's] objection.

J.A. at 69–71.

After the district court adopted the PSR as-is, it determined the advisory Guidelines range was 360 months to life. Noting the downward variances given to several of Pliego-Pineda's co-defendants and the government's motion for a downward departure, the district court heard from the parties.

Defense counsel maintained Pliego-Pineda was entitled to a downward variance, which would result in a sentence below that received by higher-level members of the conspiracy. The government agreed a downward variance was appropriate and praised Pliego-Pineda's actions, as outlined in the government's motion for downward departure. Additionally, Pliego-Pineda made a statement on his own behalf.

Thereafter, the district court found "a very significant variance [wa]s appropriate before application of the [government's motion]." J.A. at 89. The district court explained the sentence, prior to consideration of the government's motion, would be 180 months. But, granting the government's motion, the district court sentenced Pliego-Pineda to 120 months of imprisonment, followed by three years of supervised release.

Thereafter, Pliego-Pineda timely filed this appeal.

## II.

"[C]ourts of appeals must review all sentences . . . under a deferential abuse-of-discretion standard." *Gall v. United States*, 552 U.S. 38, 41 (2007). Under the *Gall* standard, we must first "ensure that the district court committed no significant procedural

9

error, such as failing to calculate (or improperly calculating) the Guidelines range . . . [or] selecting a sentence based on clearly erroneous facts . . . ." *Id.* at 51.

Because the question of whether a role enhancement applies is a factual determination, it is reviewed for clear error. *United States v. Kellam*, 568 F.3d 125, 147–48 (4th Cir. 2009). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

Where a sentence is free from procedural error, the Court next considers whether it is substantively reasonable based on the totality of circumstances. *Gall*, 552 U.S. at 51. "Any sentence that is within or below a properly calculated Guidelines range is presumptively reasonable." *United States v. Louthian*, 756 F.3d 295, 306 (4th Cir. 2014).

A.

Pliego-Pineda first argues the district court clearly erred in applying a three-level managerial role enhancement.

Under the Guidelines, the district court may increase a defendant's base offense level by three levels "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive[.]" Guideline § 3B1.1(b). The parties agree there were five or more participants here.

Although the Guidelines fail to "define 'manager' or 'supervisor,' . . . we apply their common meanings." *United States v. Burnley*, 988 F.3d 184, 188 (4th Cir. 2021);

10

*see, e.g.*, *United States v. Slade*, 631 F.3d 185, 190 (4th Cir. 2011) (applying the dictionary definition of "manager").

The Court has explained that a district court, in applying the common meaning of these terms, "must consider" the following seven factors set forth in the commentary:

> [1] the exercise of decision making authority, [2] the nature of participation in the commission of the offense, [3] the recruitment of accomplices, [4] the claimed right to a larger share of the fruits of the crime, [5] the degree of participation in planning or organizing the offense, [6] the nature and scope of the illegal activity, and [7] the degree of control and authority exercised over others.

*Burnley*, 988 F.3d at 188 (alterations in original); *see* Guideline § 3B1.1 cmt. 4 (setting forth the same seven factors).

Neither party has disputed we are bound by this commentary. *Cf. United States v. Campbell*, 22 F.4th 438, 445 & n.3 (4th Cir. 2022) (explaining the Court should defer to the commentary only where the Guideline is "genuinely ambiguous . . . [after] exhaust[ing] all the 'traditional tools' of statutory construction" (alterations in original) (quoting *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019))).

Under Guideline § 3B1.1(b), a three-level enhancement "is appropriate where the evidence demonstrates that the defendant 'controlled the activities of other participants' or 'exercised management responsibility.'" *Slade*, 631 F.3d at 190 (quoting *United States v. Bartley*, 230 F.3d 667, 673–74 (4th Cir. 2000)). In *Bartley*, the Court held coordinating the activities of others is sufficient to warrant the enhancement. Indeed, the Guidelines make clear the management or supervision of just one participant alone renders the enhancement appropriate. Guideline § 3B1.1 cmt. 2.

11

Having reviewed the record as a whole, we are unable to conclude the district court clearly erred in finding Pliego-Pineda constituted a manager or supervisor of a criminal activity involving five or more participants.

As to the exercise of decision-making authority, the organization vested Pliego-Pineda with significant authority. He decided whether to trust particular buyers and whether to arrange recurring deals involving large quantities of methamphetamine in various forms.

Further, as to the nature of participation in the conspiracy, Pliego-Pineda served as the organization's primary contact in Atlanta, connecting the supplier in Mexico with buyers in North Carolina.

Pliego-Pineda also had a high degree of participation in organizing the offense. As a self-proclaimed "middle man," J.A. at 128, Pliego-Pineda negotiated the price of large-scale transactions; arranged interstate and international drug deliveries; fronted supply to, and accepted partial payments from, buyers; managed, and presumably distributed, thousands of dollars in drug proceeds; and oversaw issues regarding the quality and quantity of drugs sold.

Next, as to the nature and scope of the criminal activity and the requirement it involve at least five participants, the conspiracy consisted of at least ten individuals trafficking large amounts of methamphetamine throughout Mexico, California, Georgia, and North Carolina. Although the district court lacked direct evidence of Pliego-Pineda instructing couriers to deliver drugs, this is immaterial, as an abundance of circumstantial evidence indicates Pliego-Pineda, as the Atlanta hub of the organization, controlled the

12

activities of Pineda, Mondragon-Penaloza, Garcia-Tovar, Bustos-Martinez, and unnamed individuals who shipped packages of liquid methamphetamine from Mexico in December 2019 and June 2020.

In explaining its decision to apply the three-level enhancement, the district court stated:

> [Pliego-Pineda] certainly was involved in the recruitment and approval of the [UC] as an accomplice. . . . He is telling the [UC], which is an important point, take -- deliver the money this way, put it in the bank account. He is supervising the [UC's] actions, or managing them, certainly.

J.A. at 69, 70. The district court erred in this regard, inasmuch as it was improper to consider Pliego-Pineda's supervision of the UC. In doing so, the district court effectively found the UC to be a participant in the criminal activity. But, "[a] person who is not criminally responsible for the commission of the offense (e.g., an undercover law enforcement officer) is not a participant." Guideline § 3B1.1 cmt. 1.

Notwithstanding this error, as explained above, nearly all of the remaining factors support the district court's factual findings. *See Scott v. United States*, 328 F.3d 132, 137 (4th Cir. 2003) (explaining this Court is "entitled to affirm on any ground appearing in the record").

In sum, "[i]n a drug distribution case such as this one, the management enhancement is appropriate for a defendant who arranges drug transactions, negotiates sales with others, and hires others to work for the conspiracy." *United States v. Matthews*, 168 F.3d 1234, 1249 (11th Cir. 1999). Accordingly, we affirm the district court's application of the three-level enhancement.

13

B.

Pliego-Pineda next argues his sentence was substantively unreasonable due to the district court's erroneous application of the managerial role enhancement.  Inasmuch as the Court holds the district court properly applied the enhancement, based on Pliego-Pineda's argument, we also hold the sentence was substantively reasonable.  *See Louthian*, 756 F.3d at 306 ("Any sentence that is within or below a properly calculated Guidelines range is presumptively reasonable.").

III.

For the foregoing reasons, we affirm Pliego-Pineda's sentence.

*AFFIRMED*

14